IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

In the Matter of the Detention of:

T.S.

No. 88384-4-I

DIVISION ONE

UNPUBLISHED OPINION

COBURN, J. — T.S. appeals a 14-day commitment order under the Involuntary Treatment Act (ITA), chapter 71.05 RCW. T.S. argues that there was not sufficient evidence to support the superior court's findings that he presents a likelihood of serious harm to the property of others and that he is gravely disabled. We disagree and affirm.

FACTS

T.S. lived in an apartment at the Aurora House, a permanent supportive housing facility owned and operated by Downtown Emergency Service Center (DESC). DESC housing case manager Josef Rawert knew T.S. for about eight years and more recently worked with T.S. as his housing case manager[1] for about a year and a half, starting around November 2023. Throughout this 18-month period, T.S. expressed grandiose

---

[1] Rawert's role as a housing case manager was to help residents sustain their housing, including accompanying residents to their medical or social service appointments, helping residents to apply for benefits and services, and sometimes assisting residents with cleaning their rooms.

delusional thoughts, including delusions about court cases and putting government officials in jail.

The toilet in T.S.' apartment was leaking when Rawert became his housing case manager. Rawert repeatedly approached T.S. to get the toilet repaired. Though he would sometimes be initially amenable to the idea of repairing the toilet, T.S. refused to cooperate with any actual repair efforts.

In late May 2025 Rawert entered T.S.' apartment and observed physical signs of a fire. Rawert saw that T.S.' room was covered with fire extinguisher powder and there was dark charring and soot "at what appeared to be the source of the fire." Outside of T.S.' door was an electrical device labelled "Westinghouse Electronic air purifier" made partly of wood. The wood was charred, with some of it burned down to charcoal or charcoal dust "like [ ] wood in a fireplace." T.S. told Rawert that the fire "was no big deal" and he had it "under control." T.S. said he put the fire out by pouring water on the electrical device.

T.S.' studio efficiency apartment has a hallway leading up to the living area, which includes a bedroom, living room, and kitchen area. On the day that the fire occurred, Rawert observed that the hallway was "so cluttered with things" that the door to the apartment could not fully open. The hallway was stacked up to the ceiling with things that left only a narrow pathway to the living area. The "living room area" was similarly cluttered. The bathroom was also "stacked very high with all kinds of objects with a very narrow path to the toilet and … sink." Rawert saw cockroaches in the apartment. Rawert also observed "obvious" problems with the flooring around the toilet, including "[b]rown and black areas emanating from the toilet base area, [with] soft floor

2

around the toilet area." Based on the damage, Rawert believed the toilet became detached from the floor at some point due to "roughness" or being "bumped."

On June 16 DESC mental health case manager Adam Klanecky[2] referred T.S. for an evaluation by a designated crisis responder (DCR).[3] DCR Ari Lesh subsequently filed a petition[4] seeking to initially detain T.S. for 120 hours due to T.S.' alleged behavioral health disorder. The petition stated that T.S. was "at imminent risk of serious physical harm" based on his "inability to care for his basic needs and safety" and that T.S. was "a danger to property as evidenced by creating a dangerous environment in his apartment." A superior court commissioner granted the petition for initial detention, finding that, because of a behavioral health disorder, T.S. presented a likelihood of serious harm to the property of others and was gravely disabled.

Following T.S.' initial detention, Fairfax Behavioral Health (Fairfax) filed a petition seeking 14 additional days of involuntary treatment for T.S. The superior court held a probable cause hearing on July 1. Fairfax presented testimony from Fairfax lead court evaluator Brian Hayden[5] and Rawert in support of the 14-day petition.

Rawert testified to the current state of the apartment as being "uninhabitable because the main living area is completely dirty." Rawert testified that in addition to cockroaches, he more recently observed spiders and spider eggs in the apartment. According to Rawert, "the floor hasn't been cleaned in years." Rawert said, "In the

---

[2] Klanecky worked for DESC's "HOST Program."

[3] The ITA defines a "[d]esignated crisis responder" as "a mental health professional appointed by the county, by an entity appointed by the county, or by the authority in consultation with a tribe or after meeting and conferring with an Indian health care provider, to perform the duties specified in this chapter." RCW 71.05.020(17).

[4] Attached to the petition were declarations from Klanecky and Rawert.

[5] Hayden testified his full title was "court services manager and lead court evaluator."

bathroom, the floor is of particular concern, because of all the discoloration around, and black around the toilet and the soft floors. I believe the toilet will need to be replaced – taken out, and probably all the linoleum needs to be replaced."

Rawert generally recalled multiple attempts to engage with T.S. regarding his plans, or willingness to allow efforts, to fix the bathroom, clean the apartment, or reduce clutter. Rawert testified that T.S. was sometimes amenable and sometimes not amenable, but that he would ultimately refuse to receive any help or cooperate with efforts to address these apartment conditions and made statements like, "I'll see you in court." Rawert recalled a particular conversation he had with T.S. around February about the apartment in which T.S. told Rawert that "there will be no change" in the apartment. Rawert testified to T.S.' mental state, "[T.S.] appears frequently to me in the morning or in the afternoon, coming and going. He'll often return and talk about his court cases. Chatting with him for a while, it becomes clear it's quite delusional."

In preparation for his testimony, Hayden, a licensed mental health counselor, reviewed records that Fairfax received from the admitting hospital and records generated at Fairfax, attempted to a conduct a "one-to-one" interview with T.S., and consulted with the Fairfax treatment team. Hayden also considered Rawert's testimony at the hearing.

Hayden opined that T.S. had a working diagnosis of schizophrenia that had a substantial adverse effect upon his cognitive and volitional function. T.S. did not believe he was suffering from mental health issues and did not need or want to take medications. While hospitalized at Fairfax, T.S. expressed delusional thought content and made grandiose claims that he had a law firm and had won multiple court cases.

4

Hayden opined that T.S. was:

> completely oblivious to his delusions, believing that these are based in reality. That he does spend every day in court; that he has won multiple cases with the Supreme Court; and that he has reported that with the case manager, that he has already told everyone this, and they are still bringing this up and that they don't learn.
>
> So, he is saying that his understanding of his reality supersedes the consensus reality, and that the concerns of his case manager at DESC for the housing, as well as concerns here at the hospital, are irrelevant because he doesn't have these issues and, you know, we never learned. So, again, he is not showing any kind of insight regarding the facts of his situation.

According to Hayden, T.S. presented a substantial risk of harm to the property of others "[b]ased on his lack of engagement regarding the repairs to his unit; the reported refusal to make changes regarding the excess clutter; or allowing access to repair the leaking toilet." Hayden attributed T.S.' lack of engagement to T.S.' delusional thinking.

Hayden also opined that T.S., due to his mental disorder, was gravely disabled and that he was in danger of serious physical harm from failure or inability to provide for his essential needs of health and safety. Hayden testified that T.S.' grave disability was, in part, related to his delusions about not having mental health issues. Hayden expressed concern that if T.S. did not remain in the hospital he would decompensate and not seek appropriate care or treatment for the active symptoms of his mental health disorder. Hayden also opined that T.S.' housing would be at risk to "due to the clutter and unhygienic conditions." Hayden recommended that T.S. remain in inpatient treatment and that a less restrictive alternative was not appropriate based on T.S.' lack of insight regarding his need for treatment. Hayden did not believe that a less restrictive treatment alternative was in T.S.' best interest.

The court found that Hayden and Rawert's testimony was credible and

determined that T.S., due to a behavioral health disorder of schizophrenia, presented a likelihood of serious harm to the property of others and was gravely disabled under RCW 71.05.020(25)(a). The court stated in its written findings that T.S. was "delusional, tangential, grandiose, disheveled, exhibiting pressured speech, and showing limited insight." The court found that:

> [T.S.'] unit is extremely cluttered to the point that it is difficult to open the door or walk down the hallway. He has cockroaches and spiders in his unit. His toilet has been leaking for approximately a year and a half and [Rawert] observed that the floor underneath is soft and black and brown material around the toilet. When he has spoken to [T.S.] about fixing the leak [T.S.] has initially been agreeable but then has been unwilling to engage with staff to get it fixed.
> ….
> [Hayden] testified that [T.S.] has continued to exhibit active symptoms of his behavioral health disorder at Fairfax …. He has stated that he does not have mental health [disorders] and does not need mental health medications.
> ….
> The Court finds by a preponderance of the evidence that [T.S.] is in danger of serious physical harm from a failure or inability to provide for [his] essential needs of health and safety. The Court also finds by a preponderance of the evidence that [T.S.] is a substantial risk of physical harm to the property of others as a result of a mental disorder.

In its oral ruling, which the trial court incorporated into its written findings, the court found that T.S.' failure to allow the housing staff to work on his apartment was due to his behavioral health disorder. The court stated as to its finding that T.S. was gravely disabled:

> [T]hough the Court does not find that [T.S.] himself caused the – toilet breaking, the cockroach infestation, the spiders and their eggs being in the home, what is of concern about his ability to take care of his health and safety is not recognizing, due to his mental health disorder, the danger that puts to his person and his health and safety ….
> [H]is inability to have insight as to how the leaking toilet for a year and a half would be a problem; how having soft floors would be a problem, for purposes of mold, for purposes of safety, structural safety. His inability to understand and recognize that is a problem.

The clutter is – can be a lifestyle choice, and it would be fine if it didn't present a risk to his health and safety. Here the Court received testimony that there was a fire, and with the difficulty – it – which was uncontested, that it kind of made it difficult to enter and exit the unit, that is a significant problem for health and safety. And his ability – inability to recognize that supports this Court's conclusion by preponderance of evidence that he's … gravely disabled.

As to its finding that T.S. presented a risk of serious harm to the property of others, the court stated:

> [A]s the Court understood from the testimony, [T.S.] is a tenant in property belonging to DESC. As a tenant, he has certain obligations to report issues within the unit; to allow for fixing of the unit, especially as it relates to property issues that can impact others, as well as himself.
> … [B]ased on what was testified to, that the flooring was soft, that the toilet had been leaking, and that there was black and brown material, I guess, around the toilet, that there is damage to the property. And that damage would at least have to involve money to fix.
> … [B]ased on the evidence I received, I can find that … his behavior in refusing to allow them to come and fix and address the issues within the unit caused substantial damage. … [T.S.'] refusal for a year and a half to allow people to come in to fix it, likely caused, by a preponderance of the evidence, the current state it's in, which apparently is likely to result in having to replace … the flooring, due to the soft flooring.

The court found that a less restrictive treatment alternative was not appropriate and not in T.S.' best interests "because he hasn't stabilized and does not have insight into his need for mental health treatment at this time." The court ordered that T.S. be detained for 14 days of involuntary inpatient treatment.

T.S. appeals.[6]

DISCUSSION

Under the ITA, a trial court may order that a person receive 14 days of

---

[6] Though the 14-day commitment has already occurred, appeals of involuntary commitments are not moot because the challenged order "may have adverse consequences on future involuntary commitment determinations." In re Det. of M.K., 168 Wn. App. 621, 625, 279 P.3d 897 (2012).

involuntary commitment if it finds by a preponderance of the evidence that the person, due to a behavioral health disorder,[7] presents a likelihood of serious harm or is gravely disabled. RCW 71.05.240(1), (4)(a)[8]; In re Det. of A.F., 20 Wn. App. 2d 115, 125, 498 P.3d 1006 (2021). "'Preponderance of the evidence means evidence that is more probably true than not true.'" In re Pers. Restraint of Pugh, 7 Wn. App. 2d 412, 422, 433 P.3d 872 (2019) (quoting In re Welfare of Sego, 82 Wn.2d 736, 739 n.2, 513 P.2d 831 (1973)). A trial court must also consider whether there are any less restrictive alternatives to involuntary detention and if such alternative treatment options "are in the best interests of such person or others." RCW 71.05.240(4)(a).

A person can pose a "likelihood of serious harm" in several distinct ways under the ITA, including by presenting "[a] substantial risk that … physical harm will be inflicted by a person upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others." RCW 71.05.020(37)(a)(iii). This court has generally interpreted a showing of a "substantial risk of physical harm" to require evidence of a recent overt act that caused harm or creates a reasonable apprehension of dangerousness. In re Det. of T.C., 11 Wn. App. 2d 51, 57, 450 P.3d 1230 (2019) (quoting In re Harris, 98 Wn.2d 276, 284-85, 654 P.2d 109 (1982)). The ITA further instructs the trial court that

> (3) In making a determination of whether there is a likelihood of serious harm in a hearing conducted under RCW 71.05.240 or 71.05.320, the court shall give great weight to any evidence before the court regarding

---

[7] A "behavioral health disorder" is defined as "either a mental disorder as defined in this section, a substance use disorder as defined in this section, or a co-occurring mental disorder and substance use disorder." RCW 71.05.020(8). A "mental disorder" is defined as "any organic, mental, or emotional impairment which has substantial adverse effects on a person's cognitive or volitional functions." RCW 71.05.020(39).

[8] RCW 71.05.240 was recently amended effective July 1, 2026. See LAWS OF 2022, ch. 210, §§ 13, 33. The language relevant to this opinion has remained unchanged.

whether the person has: (a) A recent history of one or more violent acts; or (b) a recent history of one or more commitments under this chapter or its equivalent provisions under the laws of another state which were based on a likelihood of serious harm. The existence of prior violent acts or commitments under this chapter or its equivalent shall not be the sole basis for determining whether a person presents a likelihood of serious harm.

For the purposes of this subsection "recent" refers to the period of time not exceeding three years prior to the current hearing.

RCW 71.05.245.

A person is gravely disabled if, because of a behavioral health disorder, they are "in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety." RCW 71.05.020(25)(a). The ITA should not be utilized to impose majoritarian values on a person's chosen lifestyle because it may be viewed as substandard or offensive. In re Det. of LaBelle, 107 Wn.2d 196, 204, 728 P.2d 138 (1986). Rather, a person's failure or inability to provide for essential needs must be because of a behavioral health disorder to support a finding of grave disability under RCW 71.05.020(25)(a). Id. To prove grave disability under RCW 71.05.020(25)(a), the petitioner must "present recent, tangible evidence of failure or inability to provide for such essential human needs as food, clothing, shelter, and medical treatment which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." Id. at 204-05.[9] The petitioner need not show that the danger is imminent. Id. at 203.

In an insufficiency of evidence challenge, our review is limited to determining whether substantial evidence supports the trial court's findings and, if so, whether such

---

[9] LaBelle defines "gravely disabled" under former RCW 71.05.020(1)(a) (1979). 107 Wn.2d at 202. That definition has since been as renumbered as RCW 71.05.020(25)(a).

findings support the trial court's conclusions of law and judgment. A.F., 20 Wn. App. 2d at 125. "Substantial evidence is the quantum of evidence sufficient to persuade a fair-minded person." In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015). We do not review the trial court's credibility determinations. Id. at 763. We view the evidence in the light most favorable to the petitioner. In re Det. of A.M., 17 Wn. App. 2d 321, 330, 487 P.3d 531 (2021).

We may consider a trial court's oral ruling so long as it is not inconsistent with the trial court's written findings and conclusions. State v. Kull, 155 Wn.2d 80, 88, 118 P.3d 307 (2005); see In re Marriage of Getz, 57 Wn. App. 602, 605 n.4, 789 P.2d 331 (1990) (stating that appellate court may resolve an ambiguity in a trial court's written decision by looking to its oral ruling). If a trial court expressly incorporates oral findings into its findings of fact and conclusions of law, then the court's oral findings are binding. State v. Truong, 168 Wn. App. 529, 539 n.6, 277 P.3d 74 (2012). We treat the trial court's unchallenged findings of fact as verities on appeal. In re Det. of L.S., 23 Wn. App. 2d 672, 686, 517 P.3d 490 (2022).

A. *Substantial Risk to Property of Others Under RCW 71.05.020(37)(a)(iii)*

T.S. argues that because he did not intentionally break the toilet in the apartment owned by DESC, there is insufficient evidence to show that he presented a substantial risk of harm to the property of others as evidenced by a recent overt act attributable to his behavioral health disorder.

T.S. mischaracterizes the trial court's findings. The court did not find that T.S. posed a substantial risk of harm to DESC's property because of the initial damage to the toilet in his apartment. Indeed, the court stated that it did not find that T.S. broke the

toilet himself. The court instead found that T.S. presented a substantial risk of harm to DESC's property based on his unwillingness to engage with DESC staff so that the leaking toilet could be repaired. T.S. does not challenge the court's findings that he was a tenant in a property owned by DESC and that he repeatedly refused to allow DESC staff to come into his apartment to address the leaking toilet for a year and a half, which more likely than not caused the substantial damage to the flooring that Rawert observed when he was in T.S.' apartment following the fire in May. The damage to the flooring that Rawert described—that it was soft with "[b]rown and black areas emanating from the toilet base area"—supports the court's reasonable inference that DESC would need to pay to have the flooring replaced.

T.S. does not provide developed argument to support the proposition that a petitioner under the ITA must show that a person "intentionally" damaged property to evidence a recent overt act showing a substantial risk of harm to the property of others under RCW 71.05.020(37)(a)(iii). See RAP 10.3(a)(6). T.S. cites this court's unpublished decision in In the Matter of the Detention of J.H., which is not binding and wherein we simply concluded that J.H.'s mother's testimony was sufficient evidence to support the trial court's finding that "J.H. recently destroyed property at his parents' house," which in turn supported the trial court's "conclusion of law that J.H. exhibited a likelihood of serious harm to the property of others" under the ITA. No. 81294-7-I, slip op. at 10-11 (Wash. Ct. App. June 1, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/812947.pdf; see GR 14.1(a). We did not hold in J.H. that a petitioner must establish that a person acted with a certain mens rea in "caus[ing] substantial loss or damage to the property of others" under RCW

71.05.020(37)(a)(iii), which is otherwise absent from the provision's plain language. See Hall v. Walgreens Boots All., Inc., 4 Wn.3d 447, 451-52, 565 P.3d 564 (2025) (stating that appellate courts must give effect to a statute's plain meaning and "[w]hile we read the statutory language in its full context, we do not add words to the legislation") (citing Rest. Dev., Inc. v. Cananwill, Inc., 150 Wn.2d 674, 682, 80 P.3d 598 (2003)).

T.S. does not provide authority for his assertion that his "neglect" of the apartment for the 18 months prior to the 14-day commitment hearing is not sufficient to evidence a "recent" overt act to support a finding under RCW 71.05.020(37)(a)(iii). As referenced above, the legislature defines "recent" in the other contexts of proving a recent history of violent acts or recent prior commitments as within "three years prior to the current hearing." RCW 71.05.245. T.S. fails to show that the trial court erred in considering his consistent unwillingness to allow DESC's efforts to repair the leaking toilet over the preceding 18 months as part of its determination that he posed a substantial risk of harm to DESC's property.

We conclude that the trial court did not abuse its discretion in finding that T.S. posed a substantial risk of physical harm to the property of others under RCW 71.05.020(37)(a)(iii).

B. *Gravely Disabled Under RCW 71.05.020(25)(a)*

We reject T.S.' argument that the trial court relied on speculative evidence in finding that T.S. "is gravely disabled" because he is, due to his schizophrenia disorder, in danger of serious physical harm resulting from a failure to provide for his essential human needs of health or safety under RCW 71.05.020(25)(a).

Here, it is apparent from the trial court's unchallenged findings that the court

primarily grounded its grave disability determination in its finding that T.S., due to symptoms related to his schizophrenia disorder, lacked insight regarding the dangerous and unsanitary conditions of his apartment. The court found that T.S.' apartment was "extremely cluttered" to the point that it made ingress into and egress out of the front door difficult, which the court reasonably inferred presented significant health and safety risks. This risk was underscored by the fact that there was a recent fire in the apartment, which T.S. thought "was no big deal" and told Rawert he had "under control."

T.S. also does not challenge the court's findings regarding health and safety concerns related to his apartment being infested with cockroaches and having spiders and eggs inside. Nor does T.S. challenge the court's finding that T.S.' lack of insight regarding the need to repair the leaking toilet posed health and safety risks related to mold.

The trial court found that Rawert's and Hayden's testimony was credible. Rawert described the current state of T.S.' apartment as "uninhabitable." Rawert testified that T.S. refused to change the conditions of his apartment, including reducing the amount of clutter. Hayden's testimony supports the court's finding that T.S.' failure to allow DESC staff to "make changes" in the apartment was directly attributable to T.S.' behavioral health disorder. Hayden described T.S. as lacking any insight regarding the reality of his situation, including T.S.' delusional belief that concerns about his housing were "irrelevant" based on T.S.' belief that "he doesn't have these issues." Hayden, in addition to testifying that T.S. met the criteria of grave disability under RCW 71.05.020(25)(a), opined that T.S.' housing would be at risk due to the clutter and unhygienic conditions of his apartment if he was discharged without further treatment.

13

Based on the foregoing analysis, we conclude that substantial evidence supports the trial court's finding that T.S. was gravely disabled under RCW 71.05.020(25)(a).[10]

CONCLUSION

We affirm.

_Cohen, J._

WE CONCUR:

_Bui, J._          _Smith, J._

---

[10] Because we conclude that the trial court properly determined that T.S. was gravely disabled under RCW 71.05.020(25)(a) based on the findings discussed above, we need not discuss T.S.' challenges to the court's additional findings of fact not discussed here. See In re Det. of Paschke, 136 Wn. App. 517, 521, 150 P.3d 586 (2007) ("We may affirm a trial court's decision on any ground supported by the record.").